Filed 12/13/21  P. v. Firman CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D078560 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD239217) |
| MARCO ANTONIO FIRMAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Peter C. Deddeh, Judge.  Reversed and remanded with directions.

Law Office of Stein and Markus, Andrew M. Stein, Joseph A. Markus, and Brentford Ferreira, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal, Lynne G. McGinnis, and Susan Elizabeth Miller, Deputy Attorneys General, for Plaintiff and Respondent.

In 2013, a jury convicted Marco Firman of first degree murder (Pen. Code,[1] § 187, subd. (a)) and possession of a firearm by a felon (§ 12021, subd. (a)(1)). The jury found the crime was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)) and found that a principal in the crime personally used a firearm causing the death of the victim (§ 12022.53, subds. (d), (e)(1)). Firman was sentenced to an indeterminate term of 80 years to life in prison.

Firman appealed and this court affirmed the judgment in an unpublished opinion, *People v. Firman*, D064110 (Oct. 20, 2014).

In 2019, Firman filed a petition for resentencing under section 1170.95. The trial court appointed counsel, received briefing, and held a hearing. The court thereafter denied the petition by written order.

In its order, the trial court analyzed some of the evidence from the record of the trial. Based on that evidence, the court found that Firman had not stated a prima facie case for relief under section 1170.95. The court denied the petition without issuing an order to show cause (OSC) and holding an evidentiary hearing. Firman appeals contending the trial court erred in relying on an evaluation of some of the trial court evidence without issuing an OSC and holding an evidentiary hearing as required by statute. The Attorney General properly agrees with Firman that the court erred in making such evidentiary findings at the prima facie stage of reviewing a resentencing petition. The Attorney General also concedes the case must be remanded with directions to issue an OSC and to hold an appropriate evidentiary hearing.

---

[1] All further statutory references are to the Penal Code.

After reviewing the record and appropriate law, we agree with the parties and reverse the order denying Firman's petition and remand with directions.

STATEMENT OF FACTS

The facts of the offenses are set forth in our previous opinion. (*People v. Firman, supra*, D064110.) We will incorporate them here for convenience.[2]

"A. *The People's Case*

"1. *Evidence relating to the shooting*

"On December 28, 2009, around 9:30 p.m., [T.R.] was shot and killed as he walked home. [T.R.] was not a member of any gang. He died from two gunshot wounds, one to the chest and the other to the back of the skull. A third gunshot, which grazed his back, did not penetrate the skin. The bullets recovered from [T.R.]'s body were consistent with having been fired from a .38-caliber or .357-caliber revolver. [T.R.] was wearing two silver chains on the night he was shot.

"The shooting happened on the corner of Landis Street and Menlo Avenue in the City Heights area of San Diego. [E.R.] and [C.G.] were walking in the area at the time. [E.R.] heard three or four gunshots and saw [T.R.] fall to the ground, but he did not see any suspects. [E.R.] asked [H.B.], who was nearby, to call the police. [H.B.], who had just driven past the corner of Landis and Menlo, had seen two men wearing black hooded sweatshirts across the street from a man who was alone. [H.B.] testified he

_____

[2]    We do so in nearly verbatim fashion except to sometimes use initials in naming third parties involved in the subject offenses to protect privacy as much as possible.

3

heard three gunshots.  He did not know whether the two men he saw on the corner were the same two men who approached him and asked him to call 911.

"At the time of the shooting, four San Diego Police Department officers, including Officer Lamar Rozsa, Jr., and his partner, Officer Adam Sharki, were at the City Heights Recreation Center, about eight blocks away from Menlo and Landis.  The officers heard three gunshots and drove east toward the shots.  Officer Rozsa testified he saw an Hispanic male jump a wall into the alley in the 3800 block of Menlo.  The man ran northbound in the alley and then jumped another wall to go westbound.  Officer Rozsa exited the patrol car and chased the suspect on foot.  He observed that the suspect was wearing a black knit beanie and a black hooded sweatshirt.  The suspect ran into a gated area of an apartment complex and escaped.  Police officers searched the common area of the apartment complex with trained police dogs.  Officer Sharki testified they found some clothes, including a black knit beanie, a black hooded sweatshirt, and a latex glove, all of which looked like the ones the suspect had been wearing.

"At trial, Officer Sharki identified Firman as the suspect he chased that night.  DNA samples taken from the latex glove, the beanie, and the black hooded sweatshirt matched Firman at a statistical rate of one in 14 quintillion for the glove, one in 40 quintillion for the sweatshirt, and one in 320 quintillion for the beanie.  Criminalist Debra Kowal testified that gunshot residue was found on the sweatshirt.

"An hour after the shooting, at around 10:30 p.m. that night, Firman called [M.L.] and asked [M.L.] to pick him up and give him a ride home. [M.L.] picked Firman up near Firman's girlfriend's apartment on University

4

and 36th.  [M.L.] observed that Firman was agitated and, although it was December, he was wearing shorts and a white tank top.  [M.L.] drove Firman home.

"In June 2010, about six months after the shooting, police began to focus their investigation on Firman and [Paul] Salinas based on information received from a confidential informant.

"[D.M.], another informant, began to work with the police in January of 2012, two years after the shooting.  [D.M.] signed a formal contract with the district attorney's office and agreed to act as an informant and join the witness protection program in exchange for the prosecutor's recommendation that he receive credit for time served in a pending case.

"[D.M.] testified that he was a member of the City Heights Juniors gang at the time of the shooting.  This was the same gang to which Firman and Salinas belonged.  [D.M.]'s gang monikers were 'Nutty Boy' and 'Maniac.'  Firman's nicknames were 'Midget' and 'Cynic.'  [D.M.]'s role in the gang was to acquire guns and dispense them to fellow gang members.

"[D.M.] testified that one and a half weeks after the shooting, he and Firman were at [D.M.]'s house smoking methamphetamine.  Firman and [D.M.] talked about the shooting, and Firman said he and Salinas, whose gang name was 'Scrappy,' were walking down the street by 'Joker's'[3] house.  Firman told [D.M.] that he and Salinas 'gang bang[ed]' a guy, meaning they asked him where he was from.  The guy said, 'Nowhere.'  Firman also told [D.M.] he took a swing at the guy and tried to take his chain, and then Salinas shot him.  They then split up and ran in different directions.  Firman

_____

3       "Rosman Ortega, a City Heights Juniors gang member, was known as Joker.

5

said the police chased him, he dumped his clothes, he hid his gun, and ran toward Joker's (Ortega's) house.  Firman told [D.M.] he had a .22-caliber gun that night, and Salinas had a .38-caliber gun.  Firman also said Ortega got both of the guns back.

"Ortega lived near the scene of the shooting.  The prosecution's gang expert opined that Ortega was one of the leaders of the City Heights Juniors gang.  Ortega lived with his mother in an area predominantly claimed by their rival gang, Eastside San Diego.

"[D.M.] testified that he spoke with Salinas a few days after [D.M.]'s conversation with Firman. Salinas told [D.M.] he got his 'K' or 'QK' ('Ques[e]ro killer'), which meant he had just committed murder.  'Quesero' (or 'Cheeser') is a derogatory term that members of the City Heights Juniors gang used to describe members of their rival street gang, Eastside San Diego.

"a.  *Salinas's audio-recorded jailhouse statements to* [*D.M.*]

"As part of his contract with the district attorney's office, [D.M.] agreed to wear a recording device and speak with Salinas about the shooting.  On February 16, 2012, [D.M.] and Salinas were placed in the same jail cell and their conversation was recorded.  Portions of the recording of that conversation were played for the jury.

"During the recorded jail cell conversation, Salinas indicated to [D.M.] that he was nervous about the case after a police officer—who the record shows was Detective Javier Padilla—interviewed him in September 2010 and showed him pictures of Firman and [D.M.].  Salinas also indicated he had lied to Detective Padilla by saying that he did not recognize the people in the pictures.  Salinas indicated to [D.M.] that he (Salinas) knew about the murder, but that law enforcement did not have proof he was the perpetrator. [D.M.] asked Salinas about a letter Salinas wrote from prison in which [D.M.]

6

was mentioned along with the murder. In response, Salinas assured [D.M.] that he was not implicating [D.M.] in the murder, but was just questioning whether [D.M.] or Firman had been contacted by law enforcement about the murder.

"During the recorded conversation, [D.M.] also told Salinas that he had heard from Firman that Firman's DNA had been found at the murder scene. Salinas replied that he (Salinas) would just have to 'ride it out.'

"Later during their jail cell conversation, [D.M.] informed Salinas that Firman had said he (Firman) had wanted to steal 'that fool[']s]' chain. Salinas asked [D.M.], 'Which one?' [D.M.] replied, 'That day, fool, *when you, when [you] guys smoked*[4] *that one fool.*" (Italics added.) Salinas then asked, 'What did [Firman] say?' [D.M.] told Salinas, 'Yeah, you guys wanted to get his chain,' and then said (referring to Firman), 'That fool's like, "I just wanted his chain[,] fool . . . .' Also referring to Firman, Salinas then told [D.M.], 'That fool was telling me [to] *let him have it*.'[5] (Italics added.) [D.M.] then told Salinas that Firman had said he (Firman) had tried to 'sock' the victim because he wanted to take his gold chain. [D.M.] then accused Salinas of killing the victim, stating, '[Y]ou just smoked that fool.' Salinas responded that he thought the victim was a Quesero. Salinas did not deny his involvement in the murder.

"During the recorded conversation with [D.M.], Salinas repeatedly referred to the 'hot one,' a term he used to refer to the murder weapon—the .38-caliber 'special' handgun. Salinas talked about 'burn[ing]' or 'bury[ing]'

---

4      "At trial Detective Padilla testified that the term 'smoke' somebody means to shoot and kill somebody.

5      "Detective Padilla testified that Salinas's phrase 'let him have it' meant to shoot the victim with a firearm.

the 'hot one' and told [D.M.] he had asked Joker (Ortega) to break the gun into pieces and burn it. Detective Padilla testified at trial that Salinas's comments to [D.M.] were significant because they indicated Salinas had told Ortega to get rid of the evidence.

"2. *Evidence relating to Salinas's robbery offense*

"During [D.M.]'s February 2012 recorded conversation with Salinas in the jail cell, Salinas revealed that he had been involved in a robbery. Specifically, Salinas revealed that he and his fellow gang members lined up 10 people against a wall and stole various items from the victims' pockets: an I-Pod Touch, eye drops, cologne, 'feria' (money), a cell phone, and a Black and Mild cigar. Salinas said he 'was fucked up' during the robbery, which meant Salinas was either drunk or 'messed up' on drugs.

"San Diego Police Department Detective Rudy Castro testified that, based on these statements by Salinas to [D.M.], he reactivated an investigation into an unsolved robbery. That robbery was committed in the City Heights area of San Diego at around 10:00 p.m. on January 14, 2010. A group of 13 or 14 young men who were standing outside of an apartment complex on 49th Street were approached by four Hispanic men. Three were wearing dark hooded sweatshirts and had bandanas over their faces. The one who was not wearing a hooded sweatshirt and did not have a bandana over his face was wearing a Padres jersey. The Hispanic men said that area was a 'Juniors' block' and ordered the young men to empty their pockets. The Hispanic men carried weapons. One had a revolver, one had a small chain saw, one had a hammer, and the one who wore a Padres jersey had a screwdriver. They went through the young men's pockets. They took a white lighter and a Black and Mild cigar from [N.G.], and took cash and a cell

8

phone from another person. From a six-pack photographic lineup, [N.G.] identified Ortega as the man in the Padres jersey.

"Five days after the robbery, on January 19, 2010, Officer Carmelin Rivera was on duty driving his patrol car in City Heights. He drove into an alley and saw a man, later identified as Salinas, who looked at his patrol car and immediately started running. Officer Rivera got out of his patrol car and chased Salinas on foot. He saw Salinas throw a gun under a parked car. Soon thereafter, Salinas stopped running and Officer Rivera and another officer took him into custody. Salinas had a white lighter, a cell phone, some cash, and a cell phone in his pockets. The gun was a fully loaded .22-caliber revolver.

"3. *Gang evidence*

"The prosecution's gang expert opined that Firman and Salinas were both members of the City Heights Juniors street gang. Eastside San Diego, which is the largest street gang in San Diego, is City Heights Juniors's main rival. City Heights Juniors claimed a small area within the territory claimed by Eastside San Diego. The shooting in this case occurred a block south of the territory claimed by the City Heights Juniors gang. The day after the shooting, detectives noticed graffiti about a block away from the crime scene that depicted a bullseye target around the letters ESD, which meant another gang was targeting Eastside San Diego.

"The primary activities of the City Heights Juniors gang included assaults with weapons.

"For purposes of count 2 (which charged Firman with possession of a firearm by a felon) and count 3 (which charged Salinas with unlawful possession of a firearm), the parties stipulated that Firman had five prior felony convictions for each of which he had served a prison commitment and

9

that Salinas was prohibited from possessing firearms by a court order as an express[ ] condition of probation prior to the shooting in this case.

"B. *Defense Evidence*

"Salinas presented no evidence.

"Firman testified that he was a member of the City Heights Juniors gang, and on the night of the murder he was not at the murder scene. He was trying to break into and steal cars, and he was wearing a black sweatshirt, a beanie, and gloves. He stated he walked past several cars, but did not break into a car that night. Firman admitted he did not previously tell officers that he was simply trying to break into cars.

"Firman testified that he did not break into any cars because he heard police cars driving toward him. He stated that he did not remember whether he heard gunshots that night and that he began running when he heard the sound of police-vehicle tires because he was on parole. He hopped over a fence, ran into an apartment complex, and hid there behind some bushes. Firman testified that he took off his sweatshirt, beanie and gloves, and stated that he did not know why he did that. He hopped over another fence and walked to his girlfriend's house. [M.L.] picked him up there and drove him home.

"Firman also testified he never talked to [D.M.] about the shooting, he was never on the corner of Menlo and Landis that night, he was not with Salinas that night, and he did not tell anybody to shoot anyone. Firman indicated he had heard of Salinas before the shooting and had only met him once when they were in Donovan State Prison.

"A defense investigator indicated he ran from the location of the shooting to where Firman was first seen running from police officers. He ran a distance of 430 yards. It took him 57 seconds to run that distance. Another

10

defense investigator testified that the world record for the 440-yard dash is 44.58 seconds.

"Officer Sharki testified he first saw Firman about 40 seconds after he heard the gunshots."

## DISCUSSION

The record demonstrates the trial court erred in finding that Firman had not stated a prima facie case for relief under section 1170.95. Given the agreement by the parties, the case should be reversed and remanded. We will only briefly discuss the issues here.

### A. Legal principles

Senate Bill No. 1437 (Stats. 2018, ch. 1015) (Senate Bill 1437) was enacted to "amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f); see *People v. Gentile* (2020) 10 Cal.5th 830, 842.) It accomplished this by amending section 188, subdivision (a)(3), to require that all principals to murder must act with express or implied malice to be convicted of that crime, with the exception of felony murder under section 189, subdivision (e). (Stats. 2018, ch. 1015, § 2.) For a felony murder conviction under section 189, subdivision (e), Senate Bill 1437 required that the defendant be the actual killer, an aider and abettor to the murder who acted with intent to kill, or a major participant in the underlying felony who acted with reckless indifference to human life. (Stats. 2018, ch. 1015, § 3.)

Senate Bill 1437 also created section 1170.95, which established a procedure for defendants already convicted of murder under the old law to

11

seek resentencing in the trial court if they believe that they could not be convicted of that crime given the above amendments to sections 188 and 189. (Stats. 2018, ch. 1015, § 4.) Section 1170.95, subdivision (c), requires the court to appoint counsel for all properly pleaded petitions, and then conduct a prima facie analysis, with briefing by the parties, as to the petitioner's eligibility before determining whether to issue an order to show cause. (§ 1170.95, subd. (c); *People v. Lewis* (2021) 11 Cal.5th 952, 960-970 (*Lewis*).)

At the prima facie stage of review, the trial court can consider the record of conviction to determine if the petitioner is not eligible for relief. The court may not, however, engage in factfinding or evidentiary evaluations at that preliminary stage. (*People v. Drayton* (2020) 47 Cal.App.5th 965, 980-981.)

### B. Analysis

The court's written order clearly demonstrates the court's error. As the Supreme Court stated in *Lewis*, *supra*, 11 Cal.5th at page 971, the court may not engage in factfinding, credibility analysis, or weighing evidence at the prima facie stage of reviewing a resentencing petition, which is exactly what the court did in this case. The error requires remand with directions.

## DISPOSITION

The order denying Firman's petition for resentencing under section 1170.95 is reversed.  The case is remanded to the superior court with directions to issue an OSC and to conduct an appropriate evidentiary hearing as required by statute.  We express no opinion on how the court should resolve the evidentiary hearing.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


AARON, J.

13